UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.

# 09-21147
## CIV-JORDAN

THE WACKENHUT CORPORATION,
a Florida Corporation,

Plaintiff,

/ McALILEY

vs.

MIAMI-DADE COUNTY, a political
subdivision of the State of Florida,
CATHY JACKSON, Director of Miami-
Dade County Audit Management
Services, and GEORGE M. BURGESS,
Miami-Dade County Manager,

FILED by AJS D.C.

APR 2 9 2009

STEVEN M. LARIMORE
CLERK U. S DIST CT
S. D. of FLA. – MIAMI

Defendant.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, THE WACKENHUT CORPORATION ("Wackenhut"), through its undersigned counsel, files its Complaint against MIAMI-DADE COUNTY ("County"), CATHY JACKSON, and GEORGE M. BURGESS, and alleges:

## NATURE OF THE ACTION

1.     This is an action by Wackenhut, a leading provider of contract security services to local, state, and federal governments, against MIAMI-DADE COUNTY, its Director of Audit and Management Services, and the County Manager pursuant to 42 U.S.C. § 1983 and the laws of the State of Florida.   This action seeks declaratory and injunctive relief as well as compensatory and consequential damages.

2.     This lawsuit arises out of a fundamentally and admittedly flawed audit performed by Miami-Dade County Audit and Management Services ("AMS") in which the AMS Director falsely accuses Wackenhut of fraudulently over-billing Miami-Dade Transit ("MDT") for security work it allegedly never performed.  Although Wackenhut has demonstrated beyond doubt that the audit is flawed, the AMS Director and the County Manager have deliberately ignored the evidence provided to them.  Instead, based upon the flawed audit's conclusions, the County Manager has demanded that Wackenhut pay the County $3.4 million dollars which the AMS Director and he claim has been over-billed.

3.     The consequences of AMS's flawed audit, and the County Manager's reliance on it, are immediate and irreparable.  The County Manager has: (1) concluded in writing that the County cannot do business with Wackenhut has recommended to the Board of County Commissioners that the County award a Wackenhut contract to a competitor; (2) threatened to pursue legal action against Wackenhut for millions of dollars in reliance upon the flawed audit; (3) caused Wackenhut's loss of the contract for security services at the Miami-Dade Juvenile Assessment Center; (4) caused the County Public Works department to cancel Wackenhut security contracts in several County Special Taxing Districts; and (5) threatened to initiate debarment proceedings which would prevent Wackenhut from doing business with the County for up to five years and jeopardize Wackenhut's existing and future contracts with other government agencies throughout the United States.

4.     But for the flawed and improperly conducted audit, none of the actions undertaken or threatened by the County Manager and the County would have occurred.  In fact, prior to the closing of the flawed audit, the County Manager recommended that Wackenhut be

awarded a contract under GSA Sector RFP 487(B).  After the AMS Director advised the County Manager of her preliminary audit results, the County Manager withdrew that recommendation.

5.      The County's actions constitute a serious and continuing deprivation of Wackenhut's rights.  Plaintiff has already been damaged in its reputation and goodwill as a result of the County's actions.  The future damages it will suffer as a result of this unfair and malicious taint on its reputation are incalculable.

## PARTIES, JURISDICTION AND VENUE

6.      Wackenhut is a Florida corporation with its principal place of business in Palm Beach Gardens, Florida.

7.      The County is a municipal entity whose actions are directed by a Board of County Commissioners (the "Board").

8.      Defendant Jackson is an individual who, at all material times, was the Director of the County Audit and Management Services Department.

9.      Defendant Burgess is an individual who, at all relevant times, was the County Manager.

10.     This action arises under the Fifth and Fourteenth Amendments to the Constitution of the United States, 42 U.S.C. § 1983, and the laws of the State of Florida.  This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.  Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred in this District.

11.     This Court also has jurisdiction pursuant to 28 U.S.C. § 2201 and 2202 to declare the rights of the parties and to grant all further relief found to be necessary and proper.

3

## GENERAL ALLEGATIONS

### The History of Wackenhut's Relationship with Miami-Dade Transit.

12.      Wackenhut is a leading provider of contract security services to local, state and federal governments.  Wackenhut has been providing security services to Miami-Dade County on the Metrorail, Metromover, Metrobus and other ancillary facilities since 1989.  These services have been provided pursuant to successive renewals of Security Officer Services Contracts between MDT and Wackenhut ("MDT Contract").

13.      Each renewal of the MDT Contract has been awarded to Wackenhut after waiver of the formal bid procedures and provisions of Administrative Order 3-38, as provided in Section 5.03(D) of the Home Rule Charter of Miami-Dade County, Florida, and as agreed upon by at least a 2/3 vote of the Board members present.

14.      Each time the MDT Contract has come up for renewal, the then County Manager recommended that the bid procedures be waived, and the Board voted to approve that recommendation.  Each recommendation and vote was the result of a finding that, except for Wackenhut, there are no qualified security providers to perform those services in Miami-Dade County.  A true and correct copy of the April 27, 2004 Miami-Dade County Resolution Authorizing Waiver of Formal Bid Procedures is attached hereto as Exhibit 1.

15.      Indeed, prior to each of those Board votes to approve negotiations with Wackenhut as the sole source vendor, the County has found that the application of privately contracted armed security guards to perform enforcement activities in the transit industry was unique to Wackenhut.  This is particularly important in Miami-Dade County because no other

4

transit property in the country utilizes private security guards to the magnitude and in the capacity of Miami-Dade Transit.

16.     For each MDT Contract, the County Manager's Office and the MDT Director at the time requested a comprehensive market analysis of available armed security service providers prior to the Board's consideration of the transit contract.   In each instance, only Wackenhut demonstrated that it could provide the law enforcement type armed guard services that met MDT's desired specifications.  Wackenhut clearly stands alone in the high level security market sector, especially for transit systems.  Indeed, after the tragic events of September 11, 2001, MDT directed that all of its facilities protected under GSA contracts be immediately transferred to the protection of Wackenhut.

17.     Almost immediately after Wackenhut commenced providing security services under the original contract in 1989, major crimes fell dramatically.  Today, crime on the Metrorail system as a percentage of ridership is a small fraction of what it was in 1989.  The substantial reduction in crime since 1989 could not have been achieved without Wackenhut effectively providing the services contemplated in the Contract, notwithstanding MDT's elimination of posts in 2006 due to budgetary constraints.

18.     The security of MDT riders and their property directly results from Wackenhut's strict requirements for its highly qualified security officers.  Wackenhut's officer requirements for the MDT Contract include not less than three (3) years law enforcement experience in either the military or civilian unit, extensive training prior to deployment in the field, background checks, psychological testing, physical examinations, and drug testing.  This has become a critical component of the MDT security program.

19.     As the County Manager has recognized, especially in a post-September 11 security environment, MDT is not the place for on-the-job training.  Wackenhut security officers are professionals who make MDT riders safe to use public transit.  Importantly, Wackenhut is the only company capable of meeting MDT's security requirements.  Successions of County Managers, MDT Directors, and Boards of County Commissioners over the last twenty years have recognized this.

20.     The MDT Contract requires a complex and dynamic operation within a large metropolitan mass transit system.  Since the contract's inception, Wackenhut has delivered to the citizens of Miami-Dade County and MDT a cost-effective quasi-law enforcement level of service through its industry leading Custom Protection Officer® ("CPO") division.

21.     In addition, Wackenhut provides other significant services to MDT.  These include station management, kiosk management, acting as ambassadors, exchanging fare medium, performing turnstile readings, maintaining revenue management logs and maintenance repair requests, opening and closing stations, and opening and closing restrooms, among other services.  All of these result in substantial cost savings to the County.  In short, for over twenty years, Wackenhut has provided transit security services to the County in a manner which the County itself, and each in a series of County Managers, have acknowledged only Wackenhut is capable of providing.

### The Juvenile Assessment Center.

22.     Wackenhut has also provided security services to the County for twelve (12) years at the Juvenile Assessment Center ("JAC").  The JAC opened in late 1997 as a pilot program to attack a "dysfunctional" arrest process for juveniles.  Since its inception, the JAC has

successfully processed over 150,000 juveniles and has served as the model for other JACs throughout Florida. Indeed, it has evolved into an internationally recognized program for dealing with juvenile offenders. Wackenhut has been integral to that success. Wackenhut performs intake, booking, processing, supervision, release and transportation services of Juvenile Detainees for the JAC. All assigned personnel are former law enforcement or correctional officers who are PAR trained and certified in CPR/First Aid & AED.

23. Since the JAC was opened, Wackenhut has implemented important measures to ensure the JAC's compliance with regulations and guidelines prescribed by the governing Department of Juvenile Justice. It has also been instrumental in the development and successful execution of the juvenile detention operational guidelines at the JAC. Wackenhut has been the only provider of Detention Officer services at the JAC, and in the twelve years it has provided those important services, not a single lawsuit has ever been filed against either the JAC or Wackenhut alleging failure of care in discharging its functions. This is a truly remarkable record for a facility of its type.

**Special Taxing District Security.**

24. Wackenhut has also provided security services to the County in a number of special taxing districts under contracts to perform security services in the Star Island, Old Cutler Bay, and Snapper Creek communities. In each of these communities, Wackenhut provides manned guardhouse and vehicle patrol services through its Custom Protection Officer® program. Wackenhut was the highest ranked bidder amongst numerous security firms bidding on the contracts for those Special Taxing Districts. The contracts are scheduled to run through September 30, 2010.

7

**Contract No. TR04-SOS.**

25.    On October 4, 2004, the County entered into a Security Officer Services Contract Number TR04-SOS with Wackenhut to provide appropriately equipped and trained security personnel at the Metrorail, Metromover, Metrobus and other ancillary facilities ("Contract"). The term of the Contract was for five (5) years.  A true and correct copy of the Contract is attached hereto as Exhibit 2.

26.    Paragraph 19.0 of the Contract provides in relevant part:

**AUDIT AND INSPECTION OF RECORDS**

> [Wackenhut] agrees that the County, . . ., or any of their duly authorized representatives, shall have the right to audit, examine, and make excerpts and transcripts from [Wackenhut's] records with respect to matters covered in this Contract and to make audit of all contracts, invoice materials, payroll records of personnel, conditions of employment, and other data relating to all matters covered by this Contract during the period of this work.

**The Audit Report Regarding Contract No. TR04-SOS.**

27.    AMS initiated an audit in September 2005 covering the period October 1, 2002 through September 30, 2005.  On April 30, 2008, AMS issued its Audit Report.  The Audit Report erroneously asserted that Wackenhut over-billed the County for services not rendered, and that security posts required to be covered were not appropriately staffed.

28.    Wackenhut fully cooperated with AMS in the audit process at every turn. Wackenhut stood ready to address any deficiency uncovered in the audit and, in fact, has done so.

29.    On May 9, 2008, Wackenhut provided the County with its Preliminary Response to Audit Report (the "Preliminary Report").  In that Preliminary Report, Wackenhut exhaustively

addressed the Audit Report's defects, including both methodological and factual defects. On August 29, 2008, Wackenhut provided the County with its Final Response to Audit Report. A true and correct copy of the Final Response to Audit Report is attached hereto as Exhibit 3. The Preliminary Report is Exhibit A to this Final Response.

30.    In meetings with the County Manager and the AMS Director after issuing its Preliminary Report, and in the Reports of its experts, James T. McClave, Ph.D. and Michael P. Elkin, CPA, which were attached to both the Preliminary Report and the Final Response to Audit Report, Wackenhut detailed the substantial flaws in AMS's testing, its overlooking of available audit evidence, its wrongful rejection of other audit evidence, and the improper conclusions that were formed because AMS did not appropriately deal with unavailable information.

31.    The County Manager was aware and had knowledge of the serious errors in the methodology employed in the audit and in the "facts" asserted in the Audit Report. The County Manager was also aware of the conclusive refutation of "facts" relied upon in the Audit Report and the untenable conclusions drawn from that flawed methodology and those unsupported facts.

32.    Despite the audit's serious flaws, on Good Friday, April 10, 2009, the County Manager issued a memorandum to Hon. Chairman Dennis C. Moss and Members of the Board of County Commissioners endorsing and adopting that audit. A true and correct copy of the Good Friday memorandum is attached hereto as Exhibit 4. In that Good Friday memorandum, the County Manager recommended that another service provider be chosen to provide security services for Metrorail and Metromover and that Wackenhut be removed from consideration for other County contracts, including the Juvenile Assessment Center contract and contracts in various special taxing districts. This recommendation was made even though the County has

repeatedly recognized that only Wackenhut is qualified to perform the essential security services required on the Miami-Dade Transit system as well as for the unique requirements of the JAC.

33.     Additionally, in the Good Friday memorandum the County Manager threatened to pursue "the recovery of the estimated $3.4 million in over-billings owed by Wackenhut, as well as debarment." The County's debarment policy prohibits any contractor deemed dishonest to work or bid on government contracts for a period of up to five years. Companies who are subject to these restrictions are generally described as having been "debarred," "suspended," or "excluded." The debarment and exclusion proceedings carry very severe repercussions. Among other things, debarment will prevent Wackenhut from bidding on County contracts for up to five years and will likely adversely impact Wackenhut's ability to procure relevant licensing in Florida and other states. Additionally, other governmental agencies from across the country require the fact of debarment to be disclosed when a vendor is soliciting government contracts. Such a disclosure virtually guarantees that Wackenhut will be precluded from obtaining government contracts in those jurisdictions.

34.     These actions have already caused Wackenhut substantial identifiable damages and will cause it irreparable harm in the future with regard to other governmental contracts.

35.     The final Audit Report prepared by AMS is fundamentally flawed. The AMS Director intentionally ignored relevant evidence and reached invalid conclusions on the substantial majority of individual transactions tested in its supposedly random sampling of billing transactions.

**The AMS Director's April 9 Closing Memorandum**

36.     On April 9, 2009, one day before the County Manager released the Good Friday memorandum, the AMS Director issued her Closing Memorandum justifying her department's work and the Audit's conclusions.  A true and correct copy of the April 9, 2009, Closing Memorandum is attached hereto as Exhibit 5.

37.     In the Closing Memorandum, the AMS Director acknowledges that the methodology employed in conducting the audit *did not meet generally accepted auditing standards*.  Because the audit results were based upon an extrapolation of data based upon a purported random sampling, it was imperative that AMS ensure that the sample used followed applicable statistical sampling principles.  AMS did not do this.  Instead, the AMS Director admits that AMS deviated from generally accepted statistical sampling practices in choosing the sample from which the final result is extrapolated.  This deviation renders the audit unreliable on its face.

38.     The starting point for the audit was the AMS Director's questioning of billings where there appeared to her to be a "discrepancy" in the Sign-in Registers.  The Sign-in Registers were, by County mandate, the sole source of back-up documentation required for Wackenhut billings.

39.     Where a purported discrepancy was noted in the Sign-in Registers, AMS resorted to review of limited secondary evidence to confirm the hours billed.  It chose to limit its review of secondary source materials to Log Books and Activity Reports (collectively, the "Log Books").

40.     Log Books were never intended, designed, or required by either the County or

11

Wackenhut to serve as a time-keeping device.  The AMS Director herself acknowledged this.  They are not reliable as evidence to discredit the time supported by the Sign-in Registers.

41.    In its Preliminary Report, Wackenhut exhaustively addressed defects, both methodological and factual, in the audit.  Along with its Report, Wackenhut provided the Expert Reports of James T. McClave, Ph.D., one of the country's foremost experts in statistical analysis, and of Michael P. Elkin, CPA/ABV, CFE, both of whom had been engaged to examine the preliminary Audit Report and opine upon it.  For his part, Dr. McClave opined upon the flaws in the statistical analysis employed by AMS.  AMS has since acknowledged those flaws but dismissed their impact on the audit conclusions.  Mr. Elkin went well beyond the flawed methodology and investigated each and every transaction (or "exception') cited by AMS in the Audit Report.

42.    Mr. Elkin tracked the very exceptions AMS selected from the universe of transactions AMS "randomly" selected to comprise the sampling pool.  He then reviewed all available secondary evidence – not just the limited evidence relied upon by AMS – to address the Audit Report's conclusions.  Mr. Elkin detailed all of that work in his Report.  That Report was provided to the County.  Based upon Mr. Elkin's analysis of the AMS audit, Wackenhut was able to disprove, in writing, that without material exception the Audit Report's conclusions were wrong.

43.    Mr. Elkin's analysis was based on the very transactions questioned by AMS. He provided compelling evidence that the overwhelming majority of exceptions AMS identified should have been approved based upon secondary evidence proving that Wackenhut officers

12

properly billed their time.   The AMS Director rejected reliance on this secondary evidence, instead choosing to rely exclusively on the limited secondary evidence selected by AMS.

44.   AMS's reliance on Log Books as the exclusive secondary source of information to evaluate the accuracy of billed time was a mistake that infected the entire audit.

45.   The AMS Director's rejection of alternate secondary source materials was wrong as a matter of sound audit practice.   Sound audit sampling and testing practice requires that an auditor consider alternative procedures that would provide sufficient evidence to form a conclusion where missing supporting documentation does not allow the auditor to do so.   The AMS Director refused to properly consider such alternative procedures and, instead, simply disallowed billings where the limited evidence reviewed by AMS (the Log Books) did not explain discrepancies to her satisfaction.   This refusal to properly consider other available evidence rendered the final result grossly inaccurate and misleading, especially since Log Books were not designed, intended, or required to be used as a time and attendance record.

46.   The lack of secondary evidence to support a Sign-in Register does not, by itself, prove that the Sign-in Register was inaccurate.   This is particularly true where the County itself established the Sign-in Register as the sole source of proof for billing purposes.

47.   The County Manager has demanded that Wackenhut pay the County $3.4 million, and has threatened Wackenhut with debarment proceedings if it refuses to pay the amount demanded.   In addition, he has caused other County agencies to disqualify Wackenhut from existing or prospective contracts.   These actions are inconsistent with the AMS Director's statement that the Audit was not intended to make a conclusive determination regarding over-billing.   At the very least, the County Manager has clearly deemed it to be conclusive.

13

48.     The County Manager's action is inherently unfair given the AMS Director's position that the Audit Report was not intended to be conclusive.  It is even more unfair when the County official responsible for administering this Contract has already testified that the AMS Director should not have relied on the exclusive secondary evidence (the Log Books) she chose to rely upon in accusing Wackenhut of wrongdoing.

49.     The AMS Director asserts that the audit examined more than 4,000 transactions, evaluated the exceptions, and found "compelling, credible, and convincing evidence" to fully persuade AMS that Miami-Dade County was intentionally over-billed by Wackenhut.  The AMS Director was able to reach this conclusion, however, only by ignoring even more compelling evidence that supported the billings.   Mr. Elkin's Report conclusively refutes the AMS "evidence."  The County, and specifically AMS, wrongfully refused to properly consider this available audit evidence, wrongly rejected audit evidence, made leaps to conclusions not supported by the evidence reviewed, and did not deal appropriately with missing evidence.  Each of these constitutes a failure to follow sound audit practice.

50.     Professional auditing standards were required to be applied to the audit.   The AMS Director has admitted that the sampling methods chosen by AMS deviated from generally accepted statistical sampling practices.   This renders the entire sampling employed by AMS, indeed the entire audit, unreliable.

51.     There is no good faith basis for the AMS Director's conclusion that Wackenhut engaged in a pattern and practice of intentionally over-billing Miami-Dade County under this Contract.

52.     Based upon the flawed audit, the County Manager issued the Good Friday memorandum. In it, the County Manager advised the Board of his conclusion that the "County cannot continue doing business with [Wackenhut]." Given that the County Manager's conclusions are derived from an audit that is methodologically and factually insupportable, his actions constitute a serious and continuing deprivation of Wackenhut's rights.

53.     Wackenhut has already been damaged by its exclusion from other Miami-Dade County contracts as a result of the Audit Report's findings. It has also been damaged in its reputation and goodwill as a result of the County Manager's actions. The future damages it will suffer as a result of this unfair and even malicious taint on its reputation are incalculable.

## COUNT I

### Violation of Fifth Amendment and 42 U.S.C. § 1983
### Against the County, Jackson, and Burgess

54.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 53 above. This claim is asserted against the County, Jackson and Burgess.

55.     The AMS Director, on behalf of the County, had final authority to conduct and close the audit. On April 9, 2009, she issued her Closing Memorandum. The County Manager, on behalf of the County and the Board of County Commissioners, had final authority to accept the Audit Report. On April 10, 2009, the County Manager did that.

56.     By means of the conduct alleged above, Defendants have deprived Wackenhut of a constitutionally protected liberty or property interest in violation of 42 U.S.C. § 1983.

57.     The April 9, 2009, Closing Memorandum concerning the audit, the Audit Report itself, and the County Manager's acceptance of that audit, has caused injury to Wackenhut's goodwill and reputation.

58.     Florida law grants a business a property interest in its reputation and goodwill. Defendants' actions constitute a denial of a constitutionally protected property interest because a government actor has deprived Wackenhut of its reputation and goodwill without the requisite procedural protections.

59.     Defendants have deprived Wackenhut of its constitutionally protected property interest by knowingly failing to follow generally accepted auditing standards in conducting the audit, by issuing a fundamentally flawed Audit Report based upon the flawed audit procedures, by failing to properly consider compelling, irrefutable evidence that would have cleared Wackenhut of any wrongdoing, and by ignoring Wackenhut's evidence that disproved the Audit Report's conclusions.

60.     In conducting the audit, Defendants were obligated to exercise their discretion in good faith and to afford Wackenhut a meaningful opportunity to present its case.  As the AMS Director herself recognized, "no sampling results are absolute and thus it is important that both sides have an opportunity to ferret out their points of contention."  The only process the Defendants afforded Wackenhut was the "opportunity" to show AMS why its proposed findings were wrong.  This "opportunity" was meaningless, however, because the arm of County government that had conducted the audit was the one left to determine whether to accept Wackenhut's objections.  In short, the "opportunity" Wackenhut was provided was a charade,

resulting in the AMS Director simply defending her Audit Report even in the face of her admission that AMS failed to follow generally accepted auditing standards.

61.     As a result of the foregoing, Wackenhut was denied due process prior to deprivation of its rights.

62.     Defendants have acted under color of state law and have deprived Wackenhut of rights, privileges and immunities secured by the United States Constitution and, specifically, the Fifth Amendment.  The County's liability for those deprivations is direct and not vicarious.

63.     As a direct and proximate result of Defendants' unconstitutional conduct, Wackenhut has suffered actual damage.

64.     The deprivation of Wackenhut's rights will continue so long as the April 9, 2009 Closing Memorandum stands and the Audit Report is deemed final by the AMS Director and the County Manager.  Therefore, Wackenhut will suffer a continuing deprivation of its rights unless and until Defendants' actions are enjoined by this Court.  Wackenhut has no adequate remedy at law to prevent such continued unlawful conduct.

## COUNT II

### Breach of Contract Against the County

65.     Wackenhut incorporates by reference the allegations contained in paragraphs 1 through 53 as though fully set forth herein.

66.     The County breached the Contract by failing to follow generally accepted auditing standards in conducting the audit, by issuing a fundamentally flawed Audit Report based upon the flawed audit procedures, by failing to properly consider compelling, irrefutable

17

evidence that would have cleared Wackenhut of any wrongdoing and by ignoring Wackenhut's evidence that disproved the Audit Report's conclusions.

67.     Wackenhut has been damaged as a result of the County's breach of Contract.

68.     Wackenhut has retained the undersigned attorneys and has agreed to pay them a reasonable fee.

## COUNT III

### Breach of Duty of Good Faith and Fair Dealing Against the County

69.     Wackenhut incorporates by reference the allegations contained in paragraphs 1 through 53 as though fully set forth herein.

70.     Every contractual obligation comes with it a corresponding duty of good faith and fair dealing, the breach of which gives rise to a separate claim for damages.

71.     Pursuant to Paragraph 19 of the Contract, the County had a contractual right to conduct an audit.  With that right, however, comes the obligation to conduct the audit fairly and in good faith.

72.     Based upon the relationship between Wackenhut and the County, the County owed Wackenhut a duty of good faith and fair dealing in the performance and enforcement of the duties and obligations arising under the Contract.

73.     The duty of good faith and fair dealing required that the County conduct an audit in accordance with generally accepted auditing standards and refrain from taking any actions which would deprive Wackenhut of the benefits to which it is entitled under the Contract.

74.     The County breached its implied covenant of good faith and fair dealing towards Wackenhut by failing to follow generally accepted auditing standards in conducting the audit, by

18

issuing a fundamentally flawed Audit Report based upon the flawed audit procedures, by failing to properly consider compelling, irrefutable evidence that would have cleared Wackenhut of any wrongdoing and by ignoring Wackenhut's evidence that disproved the Audit Report's conclusions.

75. The County was obligated to perform each and all of the above referenced terms of the Contract.

76. The County took actions to frustrate and deprive Wackenhut's reasonable expectations under the Contract, including, but not limited to, Wackenhut's expectation that the County would perform any audit in good faith and in accordance with generally accepted auditing standards.

77. Wackenhut has performed its obligations under the Contract.

## COUNT IV

### Request for Declaratory Relief Against the County Pursuant to 28 U.S.C. § 2201-2202

78. Wackenhut incorporates by reference the allegations contained in paragraphs 1 through 53 as though fully set forth herein.

79. A real, present, and genuine controversy exists between Wackenhut and the County concerning the parties' respective legal rights and obligations under the Contract relative to the County: (a) performing an audit that failed to follow generally accepted auditing standards; (b) issuing a fundamentally flawed Audit Report based upon the flawed audit procedures; (c) failing to properly consider compelling, irrefutable evidence that would have cleared Wackenhut

19

of any wrongdoing; and (d) ignoring Wackenhut's evidence that disproved the Audit Report's conclusions.

80.     A real, present, and genuine controversy also exists between Wackenhut and the County concerning the County's imminent threat of initiating baseless debarment proceedings against Wackenhut arising out of the flawed Audit Report.

81.     Wackenhut is uncertain as to its rights or obligations under the Contract with regard to the County's flawed audit and Audit Report and the County's threatened action to initiate debarment proceedings based on the flawed audit and Audit Report.

82.     A declaration by the Court of the parties' rights and obligations under the Contract will remove the doubt that presently exists and render actual and practical help in ending the controversy.

83.     This controversy has arisen because Wackenhut and the County have taken antagonistic positions in the construction of the Contract.

84.     Wackenhut is not seeking an advisory opinion.   This controversy can be adjudicated based upon present, ascertainable facts.

**WHEREFORE**, Wackenhut respectfully requests that this honorable Court:

(a)     Declare that the Defendants' actions constitute both a violation of 42 U.S.C §1983 and a breach of the parties' Contract;

(b)     Declare pursuant to 28 U.S.C. § 2201 that the County shall withhold the initiation of debarment proceedings against Wackenhut;

(c)     Issue a mandatory injunction ordering the withdrawal of the April 9, 2009, Closing Memorandum and the April 10, 2009, Good Friday memorandum;

20

(d)     Enjoin the County from relying on the flawed audit in connection with the County Manager's recommendation to award the MDT Contract to Wackenhut's competitor;

(d)     Require the County to pay compensatory and consequential damages in the amount of no less than $20,000,000 for the damages actually sustained by Wackenhut;

(e)     Require Defendants to pay Plaintiff's attorneys' fees pursuant to 42 U.S.C. §1988(b) as well as the costs of this action; and

(f)     Provide for such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

Dated: April 29, 2009
Miami, Florida

KENNY NACHWALTER, P.A.
1100 Miami Center
201 South Biscayne Boulevard
Miami, Florida 33131-4327
Telephone: (305) 373-1000
Facsimile: (305) 372-1861

By: _____
Richard H. Critchlow (Fla. Bar No. 155227)
Jeffrey T. Foreman (Fla. Bar No. 612200)
Ismael Diaz (Fla. Bar No. 0575771)

*Attorneys for The Wackenhut Corporation*

21

JS 44   (Rev. 2/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| The Wackenhut Corporation, a Florida corporation | Miami-Dade County, a political subdivision of the State of Florida, et al. |
| (b) County of Residence of First Listed Plaintiff **Palm Beach** (EXCEPT IN U.S. PLAINTIFF CASES) | County of Residence of First Listed Defendant **Miami-Dade** (IN U.S. PLAINTIFF CASES ONLY) NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED. |
| (c) Attorney's (Firm Name, Address, and Telephone Number) Kenny Nachwalter, P.A. 201 South Biscayne Boulevard, Suite 1100 Miami, Florida  33131-4327 Telephone:  (305) 373-1000 | Attorneys (If Known) |

(d) Check County Where Action Arose: ☒ MIAMI- DADE  ☐ MONROE  ☐ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

**09- CV-21147- Jordan /McAliley**

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. Security | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access to Justice |
| | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus-Alien Detainee | | |
| | ☒ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | ☐ 950 Constitutionality of State Statutes |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Re-filed- (see VI below)   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).

(See instructions second page):

a) Re-filed Case ☐ YES ☒ NO        b) Related Cases ☐ YES ☒ NO

JUDGE _____        DOCKET NUMBER _____

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity): **42 U.S.C. section 1983 for violations of civil rights under the Fifth and Fourteenth Amendments to U.S. Constitution**

LENGTH OF TRIAL via **10** days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ **20,000,000**   CHECK YES only if demanded in complaint:   JURY DEMAND: ☒ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE **April 29, 2009**

FOR OFFICE USE ONLY

AMOUNT **350.—**   RECEIPT # **999830**   IFP